# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-19-00075-CV
_____

### IN THE INTEREST OF A.M.

---

### On Appeal from the County Court at Law No. 3
### Montgomery County, Texas
### Trial Cause No. 17-07-09229-CV

---

### MEMORANDUM OPINION

Appellants Mother and Father appeal from an order terminating their parental rights to their minor daughter, Amy.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M), (O), (2) (West Supp. 2018). Mother and Father each filed an appeal. We affirm the trial court's judgment terminating the parent-child relationships between Amy and her Mother and between Amy and her Father.

---

[1] To protect the identity of the minor, we use pseudonyms to refer to the minor child, her parents, and other persons not associated with the Department, law enforcement, or service providers. *See* Tex. R. App. P. 9.8(b)(2). We also use only first names to identify CPS workers.

1

## Background and Evidence

In July 2017, when Amy was almost two years old,[2] the Department of Family and Protective Services (the Department) began a proceeding to terminate the parental rights of Mother and Father. Family Service Plan was developed for each parent.

### Testimony of Investigator for CPS

Mary, an investigator for Child Protective Services (CPS), testified that she investigated allegations of abuse or neglect involving Amy when Amy was about eighteen months old. According to Mary, CPS received a report that Mother left Amy with Daisy West, one of Amy's cousins, and Daisy did not know where Mother was or when she was coming back and had not heard from Mother. Mary agreed that she prepared the affidavit admitted as Petitioner's Exhibit 1. Mary testified that, after visiting Daisy's home, she left with Amy because Daisy did not want to care for Amy any longer. According to Mary, Daisy had previously taken care of Amy for one or two days at a time, but this time, Amy had been with Daisy for about a week. The appellate record reflects that Daisy was about twenty years old when she contacted CPS.

---

[2] The Department's petition and the final order of termination state that Amy was born in September 2015.

2

Mary testified that she received a call from Mother the next day, and Mother said she was in Colorado with a man. Mary did not recall Mother saying when she planned to return. Mary had been advised that Father was incarcerated, and she sent him a certified letter. Daisy provided Mary the names of relatives who could be possible placements for Amy, but none worked out.

<u>Testimony of Mother</u>

Mother testified that she had had five children by five men, and Amy was her youngest child. Mother explained that her eldest child died, she put her second child up for adoption, she voluntarily relinquished her rights to her third child, and her rights to her fourth child, Benny, were involuntarily terminated. According to Mother, when she met Amy's Father, she was living with Jake and Mike Dowling, although she sometimes stayed with Amy's Father. Mother started living with the Dowlings when she was about eighteen years old after her firstborn child died. She described Mike Dowling as her transportation and drug provider, and she testified that she "got high" with Mike to alleviate pain. Mother testified that although she lived at the Dowlings' house off and on for about fourteen years, Jake Dowling held her against her will for an extensive period, and she was raped by men the Dowlings brought into the house. According to Mother, she was drugged for others to exploit her. Mother allowed Amy to live there with her because she had no support system.

3

Mother testified that although she had tried to leave the Dowlings' house several times, ultimately she left the Dowlings' in February 2018, because the police forced her to leave and because Mike had tried to kill her. Mother testified that she contacted the police about the Dowlings, and at that time there were marks on her neck from Mike's hands. According to Mother, she never told anyone—including Father—what the Dowlings had done to her. Mother denied that Amy was ever exposed to danger at the Dowlings' house even though the Dowlings had drugged Mother and used her as a prostitute. Mother agreed that she would sometimes leave Amy with the Dowlings when she went to the store.

Mother believed Amy may have been sexually abused after moving out of the Dowlings' house, and Mother did not take her to a doctor or hospital. Mother left Amy with Daisy when Mother left for Colorado to smoke marijuana and to start over. Mother testified that she gave Daisy money, food, and diapers but no car seat, and Mother said she only intended to be gone for three or four days, but she later informed Daisy she would return in three to four weeks. Mother returned to Texas when she learned that Amy was in CPS custody, and Mother asked CPS to relocate her to another state to work on her service plan because she did not feel safe in Texas. When Mother returned to Texas from Colorado, she lived with another man for five to six weeks and then she returned to the Dowlings' home.

4

Mother testified that she moved to Florida in August 2018 to start over and "give [Amy] a life she deserved and foundation for her future[]" because she believed she could not get the help she needed in Texas. Before moving to Florida, Mother completed a parenting class, a drug test, and a psychological evaluation, and she signed up for family counseling. According to Mother, she had several visits with Amy, but the visits were stopped after Mother missed one because Mike Dowling had told her he would follow her from her visit with Amy and kill her. Mother testified that after she missed her visit she asked CPS for another visit with Amy, but she did not get a response. Mother acknowledged that at one visit with Amy after a hearing, Mother was "extremely upset[,]" which scared Amy and was not a healthy situation. According to Mother, she also advised her caseworker that she was going out of state, telling her she was "going out of state for vacation" because at first she intended to return. Mother testified that she had contacted the FBI about Mike Dowling, who Mother believed had tried to kill her in February 2018. Mother agreed that she had also sought help from the Governor of Texas, the FBI, and the President.

Petitioner's Exhibit 64 was admitted into evidence, which Mother read at trial, and it was her July 2016 report to the Montgomery County Sheriff's Office when she reported that Father had opened her bedroom window in the middle of the night,

5

wielding a knife, grabbed her by the hair and bit her, and stayed for about twenty minutes. The statement also alleged that Father woke Amy up, and Amy started crying. Mother agreed that this incident occurred when she was living at the Dowlings' house.

Mother testified that when her first child died, Mother was diagnosed with "massive depression[,] [] PTSD[,] and bipolar." Mother could not recall when she stopped taking medication for the bipolar disorder, but it was "[m]any years ago[,]" and she currently takes no medications. Mother agreed she became a methamphetamine user when her first child died, sometimes using daily, but she testified she had not used methamphetamine since May 2018. She agreed she had used methamphetamine with Father and with Adam Wortman. Mother testified that she first used drugs at the age of twelve and she had used Xanax, crack cocaine, and marijuana. Mother did not dispute that she had a long substance abuse history, including intravenous drug use, and that the drug use had affected her memory. Mother testified that CPS told her she had tested positive for methamphetamine during this case, but Mother denied "willingly[]" using methamphetamine. The clerk's record includes a "Positive Drug Test" for Mother dated October 2017, showing a positive result for methamphetamine. Mother testified that she had ten months' sobriety at the time of trial.

6

Mother denied using drugs when she was pregnant with Benny. Mother testified that she had been told she tried to deliver Benny by herself. According to Mother, she was living at Jake Dowling's house then and she involuntarily "underwent an exceptional amount of Special K[,]" a horse tranquilizer that causes hallucinations, and therefore she had no recollection of the event. According to Mother, she had reported to a psychologist that she performed her own C-section because she could only state what others had told her and her memory came in flashbacks. Mother agreed that she went back to live with the Dowlings after Benny's birth.

Mother had been living at her current residence in Florida for about five months at the time of trial. Mother testified that as soon as she moved to Florida, she put herself into ten days of inpatient mental health treatment. She was discharged into Adam Wortman's care without a diagnosis or medication, contacted her caseworker, and continued outpatient treatment for "life skills, mental health and drug and alcohol counseling treatment[,]" including a mental health assessment. According to Mother, in Florida she had completed random drug tests and obtained certificates for mental health counseling and drug and alcohol treatment. She also continues to participate in a recovery aftercare group and a ten-week behavioral course. She testified that she had been diagnosed with ovarian cancer after she had

her third child, she did not know whether the diagnosis was "resolved[,]" she had not been to a doctor or received treatment, and she continues to have related "issues[.]"

Mother testified that she did not graduate from high school, but she was working on her GED. Mother had not informed CPS that she had married Adam Wortman or that she was living with him. Mother currently works two jobs in Florida, and she testified that she provided proof of employment to her caseworker. Mother testified that she sent photos of her current residence to her caseworker and that the caseworker had called a police officer to visit Mother's home. Mother offered various exhibits into evidence, including copies of certificates for completing a parenting class, mental health counseling, and substance abuse counseling; a rental agreement for her current residence; the title to her vehicle; photographs of her home and of Mother with Amy; and certain records of Mother's therapy and counseling in Florida. Mother believed she had completed all required services. Mother testified that she had identified a daycare center for Amy, and in Mother's opinion, she was prepared for a life with Amy in Florida. Mother identified two friends who could serve as a support system besides her husband. Mother also identified a counseling center where she could take Amy to help Amy with the transition back to Mother's care.

Mother agreed she had been convicted twice in 2018 for evading arrest and in 2017 for criminal trespass. Certified copies of the judgments were entered into evidence. Mother agreed she missed one visitation with Amy because she was incarcerated. Mother agreed that she had reported in her psychological evaluation that every one of her relationships had ended in domestic violence, but she denied that Amy had ever been exposed to domestic violence and that Amy had been asleep when Father broke into Mother's window and held a blade to her neck.

Testimony of Father

Father testified that, in addition to Amy, he has a thirteen-year-old son and that he signed his rights over to the child's grandmother because the boy's mother was "not stable enough to care for [the child]." According to Father, he lived with his son's grandmother for a couple of years when he was about eighteen or twenty years old because he was "in and out of prison a lot then[.]" Father agreed that he was released from prison in August 2018, and at the time of trial he was living with his brother. Father met Mother about two years before Amy was born, and he lived with Mother at Jake Dowling's home when Amy was born. Father went back to prison for two years for unauthorized use of a motor vehicle when Amy was about six months old. When asked what arrangements he made for Amy when he went to prison, Father stated that Amy was fine with her Mother. Father identified

Petitioner's Exhibit 3 as a statement he signed relating to an incident in which he was assaulted for something he claimed he did not do. Father read the statement at trial, which stated that his brother-in-law started hitting Father because Father "supposedly" molested Father's niece Daisy, the person with whom Mother had left Amy.

According to Father, CPS visited him once a month while he was in prison. Father testified that his service plan was amended after he got out of prison and that he completed as much of the service plan as he could. Father stated that he gave the Department the names of two people as possible placements for Amy: his son's grandmother, who did not want to be a placement, and his brother Ramon. According to Father, he completed a substance abuse assessment and a psychological evaluation, participated in individual therapy, and submitted to random drug testing. Father agreed that he participated in visits with Amy until CPS suspended the visitations. Certificates for Father's completion of drug education classes were admitted into evidence. Certificates for Father's completion of training as a Network Cabling Specialist, in Telecommunications Technologies, and as a Smart Home Professional were admitted into evidence.

Father obtained his GED in prison. Father was on probation and worked for a septic company at the time of trial. He did not have a driver's license because he

owed surcharges, but he reported that he drove to work. Father explained that if CPS called him to do a drug test when he was working, he would not be able to go because he does not have a vehicle at work, but he would go the next day or as soon as he could. Father's lease for an address in Cleveland where he has lived since November 2018 was admitted into evidence.

Father testified that he started using methamphetamine when he was about sixteen years old but that he had not used it for two years. He denied ever having had substance abuse treatment, and his aftercare plan is to surround himself with people who do not use drugs. When asked what work he did before he went to prison, Father stated he worked with his brother remodeling houses, he worked off and on as a lineman, and he did odd jobs.

Father told the court he was not asking for Amy to come home with him but for unsupervised visitation with Amy, and he was open to supervised visitation if deemed appropriate. He acknowledged that Mother and her husband Adam Wortman live in Florida, and when asked how he would visit Amy, he responded "I know how to drive." Father also acknowledged that Mother and Adam had a child together, and their parental rights had been terminated to that child.

<u>Testimony of Adam Wortman</u>

Adam Wortman testified that he had married Mother in Florida a few months before trial. According to Adam, he had met Mother about twelve years ago and had been in a relationship with her at various times. Adam agreed that Mother was Benny's mother. According to Adam, CPS was involved "right from the beginning" because of the circumstances of Benny's birth. Adam and Mother were homeless and living in the woods when Mother went into labor, and he and Mother had not planned on anything going wrong during the delivery. Adam and Mother had done methamphetamines together, but not for about a year before Benny's birth. According to Adam, Mother had cut herself at her scar from a previous C-section because a long time had passed since her water broke and the baby could have been suffocating. Adam testified that Mother delivered Benny "in the back of a car on the way to go meet the ambulance."

Adam testified that he has four children. He lived with the oldest child until the oldest child was about four years old, and Adam "kind of backed out" when some allegations by a family member led to a CPS case. He stopped living with his second child because he left the state as a result of a CPS case. His third child lives with the child's grandmother. Adam voluntarily terminated his rights to his fourth child, Benny. He explained that he and Mother broke up after his youngest child was born

12

because he went to prison for six years. He was paroled to Florida in 2018, where his elderly mother lives.

Adam testified that he had completed two in-house drug treatment programs. He denied having any mental health diagnosis. At the time of trial, he had five years remaining on his probation. At the time of trial, Adam was working full-time for Goodwill Industries and he operated a side business reselling goods. Petitioner's Exhibit 59 was admitted into evidence, which Adam identified as a certified copy of his conviction for aggravated assault/bodily injury. Adam identified Exhibit 58 as his conviction for arson. Exhibit 60 was also entered into evidence, which was the 2013 final order of termination of Mother's and Adam's parental rights to Benny. Exhibit 61 was entered into evidence, which was the 2011 final order of termination of Adam's rights to a child older than Benny.

Testimony of Allison Allen

Captain Allison Allen, with the Montgomery County Sheriff's Department, testified that in March 2006, she worked on an investigation about a sexual assault by Father. Referring to her report, Allen testified that the alleged victim was Daisy West, who was nine years old at the time of the assault. Allen agreed that Daisy made allegations of sexual abuse by Father. Allen recalled that she filed the case with the D.A.'s office, but the D.A. refused to prosecute the charges.

13

Testimony of Sylvie Acklin

Detective Sylvie Acklin with the Conroe Police Department testified that she worked as a forensic interviewer at Children's Safe Harbor, where Daisy was referred in March 2006 following allegations of sexual abuse. According to Acklin, Daisy was eight years old at the time and alleged that her uncle sexually abused her by genital touching, genital exposure, and forced oral sex. A video-recording of a forensic interview of Daisy was admitted later in the trial as Petitioner's Exhibit 62.

Testimony of Brandy Powell

Brandy Powell, a licensed professional counselor and registered play therapist, testified that she provided therapy for Amy and was told by CPS to observe Amy and Father interacting during the counseling. Powell met with Amy and Father in three visits in October and November 2018. Powell stated that Father cried during the first meeting with Amy, and Powell generally described the visits between Amy and Father as follows: "The child did not recognize the father. She had no emotional connection with him. No foundation. No parental, no child foundation of a relationship." Powell testified that she recommended that the visits between Amy and Father be discontinued because the visits could be confusing, traumatic, or emotionally damaging for Amy because the child had no connection to Father as her father, and the clerk's record includes Powell's letter making such recommendation

14

as an exhibit to the Department's December 2018 "Motion to Suspend [Father]'s Visitation and Motion for No Contact[.]" In Powell's opinion, Amy should have had more of a relationship with Father than what Powell observed, even considering that Father had been in prison for two of Amy's three years. Powell also testified about Petitioner's Exhibits 4 through 56—various posts from Father's Facebook page that had been admitted over Father's objection—which she regarded as "Extremely violent[,] [d]emeaning[,]" "alarming[,]" and "hurtful towards women." Powell testified that, in her opinion, if Amy were returned to Father, there was a "high chance" that emotional, psychological, or physical damage to Amy would result and Powell had "very, very high concern, extremely high concern." Petitioner's Exhibits 65 through 67 were admitted, which were copies of Brandy Powell's notes of visits between Father and Amy. Powell stated in her session notes that she did not observe a parent-child bond, Amy played with Father "as if he is a stranger[,]" and uprooting Amy into Father's care "would be traumatizing."

Testimony of Brenda

Brenda, a CPS conservatorship worker, testified that she was assigned to this case in August 2017 when Mother had just returned from Colorado. According to Brenda, Mother had not had stable housing during the case, and Brenda did not think Mother had "ever had a stable place[,]" although she acknowledged that Mother had

15

reported she now had a stable place. According to Brenda, Mother never told her she had married Adam and that she was living with him, and Brenda learned this in court.

Brenda testified that Mother kept in contact with her "on and off[]" for the first year of the case, and for some time period, Mother did not have a working phone number. Brenda summarized the court-ordered service plan for Mother and testified that Mother had completed parenting classes, a psychological evaluation, and substance abuse assessment and treatment. Brenda explained that she had requested therapy notes from the Florida service providers, she had only received attendance notes and certificates of completion, and Mother's counselor in Florida was unlicensed and not approved by the Department. According to Brenda, CPS had asked Mother to do intensive substance abuse treatment after a positive drug test, but Mother refused. Brenda testified that many times when she met with Mother, Mother was "very paranoid. Very unstable[,]" was not clean, and reported that someone was recording her. According to Brenda, Mother had reported she had been kidnapped by the Dowlings for fourteen years and the Dowlings prostituted her, and because the Dowlings wanted to kill Mother and Amy, Mother demanded that Brenda send Amy to another state with Mother.

Brenda agreed that Mother attended a couple of visits with Amy but did not complete family counseling, the therapist recommended the visits be suspended, and

the court suspended her visits. Brenda described Mother's first visit with Amy as "traumatic[]":

> [Amy] looked terrified of her. She didn't want her to come close to her, not even two feet close to her. She was crying. As soon as she saw her walking in the door, she wanted nothing to do with her. And she just cried the entire visit. Mom was very inappropriate with her, and I had to stop the visit short. So we ended the visit early.

> . . .

> So [Amy] was sitting on the sofa, and, you know, she was just frightened. She looked really scared, and so she didn't want mom to come close to her, so mom kept telling her to get over it. She kept saying, get over it, get over it, and that was obviously inappropriate for a two-year-old that doesn't understand what she means by telling her to get over it. So mom just looked more -- mom looked mad at the fact that the child was acting that way. Towards her.

Brenda testified that, at the time of trial, Mother had not completed her twelve-step program, Mother only had three or four months of "clean" drug tests, and the Department did not have any drug test results for Mother for about the last ten months. According to Brenda, the Department was only obligated to pay for drug testing in Texas. Brenda had received no proof that Mother was attending an outpatient substance abuse program and only learned in October or November 2018 that Mother was attending counseling. Brenda had received attendance notes and certificates from Mother's counselors but had not received progress or therapy notes. Brenda was concerned that she did not know how often Mother's service provider

17

in Florida was sending her for drug testing. Mother's Exhibit 24 was admitted into evidence, which included records from her counseling service provider in Florida.

Brenda testified that Mother had provided no proof of income or employment except for one time in September 2018, and Brenda recalled that Mother sent a picture of her check stub and a copy of her work schedule. According to Brenda, Mother needed to send a paycheck stub at least monthly to show that she can maintain her job. Brenda arranged for a police officer to visit Mother's home in Florida in January 2019 and take photos, and the only concern the officer reported was that there were "a lot of sex offenders in that area[]" and the officer knows many people who live in that area. Brenda had reviewed the photos the officer provided and saw nothing in the photos that caused her concern. Brenda also testified that, as to proof of residency, Mother had only provided an address, and when the Florida police officer visited Mother's home, it was a different address than the one Mother had provided to the Department.

When asked what danger Amy would be in if returned to Mother, Brenda responded:

> . . . She's going to be placed with two individuals that have extensive drug use and criminal history, that she doesn't know them. She has no relationship with []either [Mother] or her husband. We are worried that she won't have a stable home because [Mother] has not been able to show that to [Amy] or provide that to [Amy].

18

Brenda also testified that, if Amy were placed with Mother in Florida, CPS would be unable to visit or do any monitoring, although she agreed that there was a procedure for requesting Florida CPS to monitor.

Brenda testified that her first contact with Father was in August 2018 when he got out of jail but that the Department had stayed in contact with him while he was incarcerated. Brenda was unaware of any cards or letters that Father sent to Amy while he was incarcerated. According to Brenda, Father missed four drug tests, he had been unable to do a hair follicle test because he did not have enough hair, but he did submit to a nail test. Brenda testified that Father had not been discharged from counseling. She agreed that Father had visited with Amy three times, until the visits were stopped, and the Department would not "hold[] that against him[.]" Brenda further agreed that the Department sought to terminate the visits based on the therapist's recommendation.

According to Brenda, Father had initially provided the name of his brother Ramon as a possible placement for Amy, but the home study determined that Ramon was not truthful, he was only borrowing a home to pass the home study, and he was really living in a small trailer that was not safe or appropriate for a child. Brenda testified that she had visited Father's home, where she observed a danger of "[b]ig

pit bulls." Brenda agreed she had concerns about Father's social media account, which she regarded as part of Father's behavior.

Brenda agreed that, although the Department's answers to interrogatories stated that it would seek termination under subsection 161.001(b)(1)(L), that there was no evidence that Father had been convicted of any of the crimes listed in that subsection. Brenda agreed that Father had completed much of his service plan requirements in the most recent six months. According to Brenda, she did not have proof of income for Father because he had not provided check stubs, but he had provided a letter from his employer.

Brenda testified that Amy had been in four foster homes. According to Brenda, Amy had to leave the second home due to the death of another child in the home. Amy left the third home after an incident where Amy was hitting the foster parent's little girl and the foster mother picked up Amy by the arm in a manner that Brenda agreed violated the CPS discipline policy. Amy was removed from the third home because the foster parents were not interested in adopting and Amy needed something more stable. According to Brenda, Amy's last foster placement occurred in August 2018, and the Department's plans were for the current foster parents to adopt Amy.

Testimony of Foster Parent

One of the foster parents ("Foster Mom") testified that Amy had been in her home for six months. The Foster Mom described Amy as smart, loving, and "very happy where she is[]" although when she arrived in the home, Amy had issues with defiance and potty training, which have now improved. The Foster Mom testified that Amy has play therapy every two weeks for aggressive behavior and seems to be making progress, and Amy plays with dolls, loves to sing, and says "I love you, mommy." The Foster Mom testified that one of Father's visitations with Amy was in the Foster Mom's home, and the Foster Mom observed Amy after the visit to be confused and more violent than usual. According to the Foster Mom, Amy has not acted in a way that suggested she wanted to see Mother or Father. The Foster Mom agreed that she and her spouse are seeking to adopt Amy.

Testimony of the CASA

The court appointed special advocate (CASA) testified that he had been a CASA volunteer for nine years and he had been assigned to Amy since August 2017. The CASA testified that he had visited Amy at least every month, she is doing "better than could be expected[]" in her current placement, where she is receiving the attention she needs. The CASA testified that he observed Amy to be "cozy" with her current foster parents and is usually smiling and happy. The CASA testified that he

observed a visit between Mother and Amy at the CPS office in August 2017, and he observed that when Mother walked into the room, Amy was frightened and tried to flee from the room.

The CASA's permanency recommendation for Amy was termination of Mother's and Father's parental rights and placement in the current foster home, which the CASA agreed was in Amy's best interest. The CASA testified that Mother's parental rights to another child were previously terminated, Mother had not shown that she could provide a safe and stable environment, Father had been in prison for twenty months for car theft, there was a previous allegation of sexual abuse of a child against Father, and Father's visits with Amy had gone badly. The CASA's report dated April 2018 was entered into evidence as Petitioner's Exhibit 71. Other CASA reports dated September 2017, January 2018, April 2018, and November 2018 appear in the clerk's record.

Testimony of Anna Patterson

Anna Patterson testified that she was the grandmother to Mother's deceased son, and Patterson has been in contact with Mother over the years. In Patterson's opinion, Mother had "cleaned herself up[,] [] has her wits about her[,] [and] got her head on straight." Patterson testified that she had offered for Amy to be placed in

her home and a home study was done. Patterson also testified that her husband "has several things on his criminal history from years ago."

<u>Issues</u>

In summary, Mother presents these issues on appeal:

ISSUE 1: The trial court erred when it terminated Mother's parental rights pursuant to Texas Family Code section 161.001(b)(1)(D).

ISSUE 2: The trial court erred when it denied Mother's motion for directed verdict regarding the issue of whether, in its case in chief, the Department proved by clear and convincing evidence Mother's parental rights should be terminated pursuant to Texas Family Code section 161.001(b)(1)(D).

ISSUE 3: The trial court erred when it terminated Mother's parental rights pursuant to section 161.001(b)(1)(E) of the Texas Family Code.

ISSUE 4: The trial court erred when it denied Mother's motion for directed verdict regarding the issue of whether, in its case in chief, the Department proved by clear and convincing evidence Mother's parental rights should be terminated pursuant to Texas Family Code section 161.001(b)(1)(E).

ISSUE 5: The trial court erred when it denied Mother's Motion to Compel Discovery and for Sanctions.

ISSUE 6: The trial court erred when it admitted Petitioner's Exhibit #60 (a previous order terminating parental rights as to another child) into evidence.

ISSUE 7: The trial court erred when it terminated Mother's parental rights pursuant to section 161.001(b)(1)(M) of the Texas Family Code.

23

ISSUE 8: The trial court erred when it terminated the parental rights of Appellant mother pursuant to section 161.001(b)(1)(O) of the Texas Family Code.

ISSUE 9: The trial court erred when it denied Mother's motion for directed verdict regarding the issue of whether, in its case in chief, the Department proved by clear and convincing evidence Mother's parental rights should be terminated pursuant to Texas Family Code section 161.001(b)(1)(O).

ISSUE 10: The trial court erred when it excluded the testimony of Appellant mother's witness Susan Sorenson.

ISSUE 11: The trial court erred when it found that termination was in the best interest of the child and requests reversal and remand of this issue.

ISSUE 12: The trial court erred when it denied Mother's motion for directed verdict on whether termination was in the best interest of the child and requests reversal on this issue.

In summary, Father presents these issues on appeal:

ISSUE 1: There was a lack of clear and convincing evidence meeting the legal and factual sufficiency required to show that Father has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.

ISSUE 2: There was a lack of clear and convincing evidence meeting the legal and factual sufficiency required to show that Father has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

ISSUE 3: There was a lack of clear and convincing evidence meeting the legal and factual sufficiency required to show that Father failed to comply with the provisions of a court order that specifically established

24

the actions necessary for him to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent for the abuse or neglect of the child.

ISSUE 4: There was a lack of clear and convincing evidence meeting the legal and factual sufficiency required to show that it was in the best interest of the child that Father's parental rights be terminated.

ISSUE 5: The Trial Court committed reversible error when it allowed in evidence and testimony not properly documented in discovery.

ISSUE 6: The trial court committed reversible error when it made faulty evidence rulings as well as allowed in highly prejudicial testimony and evidence that clearly outweighed its probative value.

Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2019); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *see also In re J.L.*, 163 S.W.3d at 84. We will affirm a judgment of termination if any one of the grounds is supported by legally and factually sufficient evidence and the best interest finding is also supported by legally and factually sufficient evidence. *In re C.A.C.*, No. 09-10-

25

00477-CV, 2011 Tex. App. LEXIS 3385, at **13-14 (Tex. App.—Beaumont May 5, 2011, no pet.) (mem. op.).

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d at 86-87).

We review directed verdicts under the same legal-sufficiency standard that applies to no-evidence summary judgments. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003). Accordingly, a trial court must grant a directed verdict if

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*See King Ranch*, *Inc.*, 118 S.W.3d at 751.

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute). Generally, we will affirm the termination order if the evidence sufficiently establishes any statutory ground that the trial court relied on in terminating parental rights as well as the best interest finding. *See id.* However, due process requires a heightened standard of review of a trial court's finding under subsections 161.001(b)(1)(D) or (E), even when another ground is sufficient for termination, because of the potential consequences for parental rights to a different child. *See In re N.G.*, No. 18-0508, 2019 Tex. LEXIS 465, at *8 (Tex. May 17, 2019) (per curiam). Because subsection 161.001(b)(1)(M) alone provides a sufficient basis

27

to terminate parental rights based on a previous subsection 161.001(b)(1)(D) or (E) finding, due process concerns, and the requirement for a meaningful appeal require that, if a court of appeals affirms the termination on either of these grounds, it must provide the details of its analysis. *Id.* at \*13 (citing U.S. Const. Amend. XIV, § 1; Tex. Const. art. I, § 19; *In re S.K.A.*, 236 S.W.3d 875, 890 (Tex. App.—Texarkana 2007, pet. denied)).

We review the admission of evidence for an abuse of discretion. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). "To obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must show that the trial court's ruling was erroneous and that the error was calculated to cause, and probably did cause, 'rendition of an improper judgment.'" *Benavides v. Cushman, Inc.*, 189 S.W.3d 875, 879 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (quoting Tex. R. App. P. 44.1(a)(1); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)); *see also* Tex. R. App. P. 61.1. In conducting this harm analysis, we review the entire record. *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 754 (Tex. 1995);

28

*Benavides*, 189 S.W.3d at 879. The erroneous admission is harmless if the evidence is merely cumulative of evidence admitted elsewhere at trial. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). Whether erroneous admission of evidence is harmful is a matter of judgment rather than a precise measurement. *Id.* We may also consider the amount of emphasis placed on the erroneous evidence. *Id.*

<u>Challenges to Discovery</u>

Both Mother and Father argue in issue five that the trial court erred in admitting evidence not provided to them during discovery, and Mother argues the trial court erred in denying her motion to compel discovery and for sanctions. When a party has failed to timely identify evidence in response to discovery requests, the trial court has the discretion to postpone the trial and to impose an appropriate sanction upon the offending party for abuse of the discovery process. *See* Tex. R. Civ. P. 215.1, 215.3; *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 915 (Tex. 1992). An appellate court reviews a trial court's ruling on a motion to compel discovery for abuse of discretion. *See Johnson v. Davis*, 178 S.W.3d 230, 242 (Tex. App.— Houston [14th Dist.] 2005, pet. denied) (citing *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004) (discussing discovery sanctions)). An abuse of discretion does not

occur if some evidence reasonably supports the trial court's decision. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

In Father's fifth issue he contends that the Trial Court erroneously allowed evidence and testimony into the record not properly documented in discovery. Father argues that all evidence admitted by the trial court "not related" to subsections L, N, and O should have been excluded and not used as grounds for termination. This argument is insufficient to preserve any error because it fails to specify what testimony or evidence Father challenges, and where the evidence appears in the record, and because Father cites no legal authority in support of the argument. *See* Tex. R. App. P. 33.1, 38.1(h); Tex. R. Evid. 103(a)(1); *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 234 (Tex. 2011) ("Error is preserved with regard to a ruling that admits evidence if the opponent of the evidence makes a timely, specific objection and obtains a ruling."). Additionally, this objection does not comport with the objection that was made in the trial court. Generally, to present a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion stating with sufficient specificity the grounds for relief sought and that the trial court ruled on the complaint, either expressly or implicitly. *See* Tex. R. App. P. 33.1(a); *see also In re A.L.S.*, 338 S.W.3d 59, 70 (Tex. App.—Houston [14th Dist.] 2011, pet. denied).

Father also points out in his appellate brief that he cross-examined the Department's witness regarding the grounds for termination stated in the Department's responses to interrogatories:

> Q. Ma'am, in your answers to interrogatories, did you say specifically you were going to terminate my client on the L grounds, the N grounds, and best interest?
>
> A. Yes.

According to Father, CPS worker Brenda stated the Department would terminate Father's parental rights to Amy based on subsection L even though the Department had not pleaded subsection L in its original petition, and Father argues that Brenda admitted there was no evidence to support termination based on subsection L. To the extent that Father is arguing the trial court erred in admitting "any" evidence and testimony into the record to support subsection L, the only record references he includes in his brief pertain to questions and testimony he elicited during his cross-examination of witnesses and Father cannot complain on appeal about the admission of testimony that he elicited or introduced. *Kenneth H. Hughes Interests v. Westrup*, 879 S.W.2d 229, 239 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("A party may not complain on appeal that evidence was improperly admitted when that party itself elicited the same evidence or evidence of a similar character.").

31

On appeal, Father also argues that the State "constructively abandoned" subsection O as a basis for termination because Brenda testified that the State would not hold it against him that he did not continue regular visits with Amy. This complaint does not meet briefing requirements, and this complaint does not comport with the objection Father made in the trial court. *See* Tex. R. App. P. 33.1, 38.1(i). Next, Father argues on appeal that Brandy Powell testified about visitations she observed, and she expressed her opinion on Father's Facebook postings although the Department had only disclosed her as a witness "for parent services including counseling and parent classes." At trial, the Department responded to this objection and represented to the trial court that Powell was disclosed as an expert and included in the Department's supplemental disclosures. The Department also argued that Powell would not be surprised because Powell had testified at previous hearings and Father had met her when she provided supervision of his visits with Amy.

Father also argues on appeal that the testimony of Officer Allen was not disclosed before trial. At trial, when Allen testified, Father's attorney objected as follows:

> [Father's Attorney]: Objection, Your Honor, in the discovery turned over to us the only person from the Montgomery County Sheriff's Office was a custodian of records testifying to the authenticity of business records.

[Department's Attorney]: Judge, we supplemented our disclosures and it contained this officer's name and contact information.

[Father's Attorney]: When were those supplements done?

[Department's Attorney]: Do you want --

THE COURT: I'm not sure I understand what we're doing.

[Department's Attorney]: I'm not either. We supplemented and we gave information. I supplemented disclosure containing this witness' name. He['s] asking me a question on that and I'm not sure it's proper for me--

[Father's Attorney]: I don't know if it's been properly supplemented in a timely fashion. And, I--

THE COURT: Probably a lot of things you don't know.

[Father's Attorney]: That's why I was asking.

The Department represented to the court that it had disclosed both Allen and Powell as witnesses, that Powell's recommendations were presented in previous hearings, and that Powell's testimony on father's visitation with Amy should not be a surprise to Father because Father had met with her during the visits and Powell testified during prior hearings.

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer*, 701 S.W.2d at 241-42. Tex. R. Civ. P. 193.6 permits a trial court to admit evidence not provided during discovery if the offering party shows either (1) good cause for its discovery

33

failure or (2) the lack of unfair prejudice or unfair surprise to the opposing party. The trial court has discretion to determine whether the offering party met its burden. *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 383-84 (Tex. App.— Dallas 2003, pet. denied). On the record before us, we cannot say the trial court abused its discretion in overruling the objections and in admitting the testimony of Allen and Powell.

Father also complains on appeal that the original CPS supervisor and current counselor were "neither called as witnesses or even listed in discovery." Father then argues that "[o]nce the lack of appropriate responses is raised, some sort of ruling, hearing, evidence should have been taken to show good cause for the lack of disclosure as well as the lack of surprise to the Appellant." As we previously noted, we did not find a motion to compel or other pretrial request in the record for Father. Nor does he provide any record references to establish that he brought this complaint to the trial court's attention prior to or during trial. Father provides inadequate briefing on this complaint and he has failed to establish that he presented it to the trial court. *See* Tex. R. App. P. 33.1, 38.1(i).

Mother argues that the trial court erred in denying her motion to compel discovery and for sanctions. Mother filed a motion to compel discovery and for

sanctions the day that the trial began.[3] Mother's motion to compel avers that she served a request for production on the Department on November 21, 2018, and a response was served on December 19, 2018, and supplemented on January 10 and 25, 2019. A failure to obtain a pretrial ruling on discovery disputes that exist before trial constitutes a waiver of any claim for sanctions based on such conduct. *See Remington Arms Co., Inc. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993) (orig. proceeding).

Mother argued in her untimely motion to compel that the Department had failed to produce certain evidence including, but not limited to, case narratives from October 25, 2018 to the present, a home assessment, and photographs of Mother's home. On appeal, Mother argues that the Department's failure to produce certain evidence was an evasive or incomplete answer that was tantamount to a failure to answer under Rule 215.1(c). *See* Tex. R. Civ. P. 215.1(c). Mother argues that the trial court's error in not granting the motion "resulted in undisclosed documents being admitted into evidence, namely Petitioner's Exhibit #60." Petitioner's Exhibit 60 is the final order terminating Mother's and Adam Wortman's parental rights to Benny.

---

[3] The clerk's record reflects that the Motion to Compel Discovery and for Sanctions was filed on February 13, 2019, however, in the reporter's record on February 14, 2019, Mother's attorney stated that she filed the motion "this morning."

At trial, when Mother's attorney announced her motion to compel, the Department argued that "there are a lot of problems with her coming forward with the motion today." The trial court stated "You're exactly right in the sense that she should have before now when she learned about it. Filing that on the morning of trial is not a good time to do it." The court explained that if the Department did not intend to introduce the items identified in the motion to compel into evidence, there was no issue, and if the Department did introduce the items into evidence and Mother could convince the court of surprise, the cure would be to exclude those items from evidence. The court took the motion under advisement. When Mother raised the motion again later at trial, Mother agreed that the motion was filed after trial had started, and the trial court denied the motion. Therefore, Mother did not preserve any error on this complaint. *See* Tex. R. App. P. 33.1.

Petitioner's Exhibit 60 was not listed as a nondisclosed item in Mother's motion to compel, and Mother did not address Exhibit 60 in her argument she made during trial. Mother's brief does not argue that the Department offered into evidence any of the allegedly undisclosed items specifically listed in the motion to compel.[4] Even assuming Mother did not waive error on this issue, on this record, we cannot

---

[4] Although Mother's motion to compel alleged that the Department had not produced photographs of Mother's home, Mother entered into evidence photographs of her home as Respondent Mother's Exhibits 11 through 20.

say that the trial court abused its discretion or acted unreasonably in failing to grant Mother's motion to compel. *See Johnson*, 178 S.W.3d at 242. We overrule Mother's and Father's fifth issues.

Father's Rule 403 Complaints

Father complains in his sixth issue that the trial court erroneously admitted other items of evidence: (1) allegations of a sexual assault, (2) certain "unseemly and potentially grotesque" Facebook memes and posts, and (3) a hearsay statement read by Father. According to Father, the items were "highly prejudicial, almost completely lacking in probative value[], and by [their] very nature harmed" Father's rights.

The fact that evidence has some prejudicial effect is insufficient to warrant its exclusion. *Pittsburgh Corning Corp. v. Walters*, 1 S.W.3d 759, 772 (Tex. App.—Corpus Christi 1999, pet. denied). To be excluded, evidence must not only create a danger of unfair prejudice, but that danger must substantially outweigh its relevance. *See* Tex. R. Evid. 403; *In re A.D.*, 474 S.W.3d 715, 727-28 (Tex. App.—Houston [14th Dist.] 2014, no pet). The decision to admit or exclude evidence subject to a Rule 403 objection lies within the sound discretion of the trial court. *Decker v. Hatfield*, 798 S.W.2d 637, 639 (Tex. App.—Eastland 1990, writ dism'd w.o.j.). Rule 403 favors the admission of relevant evidence and presumes that relevant evidence

37

will be more probative than prejudicial. *Murray v. Tex. Dep't of Family & Protective Servs.*, 294 S.W.3d 360, 368 (Tex. App.—Austin 2009, no pet.). Unless the record shows the trial court did not perform the balancing test, courts find no error when the trial court simply listened to the defendant's objections, then overruled them. *In re K.C.P.*, 142 S.W.3d 574, 584-85 (Tex. App.—Texarkana 2004, no pet.).

Because the best interest of the child must always be the primary consideration in a parental rights termination case, evidence relevant to the best interest of the child will seldom be excluded under Rule 403. *See In re B.C.*, No. 02-15-00175, 2015 Tex. App. LEXIS 10639, at *3 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.) (citing *Garza v. Garza*, 217 S.W.3d 538, 555 (Tex. App.—San Antonio 2006, no pet.) (exclusion of evidence under Rule 403 is an extraordinary remedy to be used sparingly in a parental rights termination case); *In re J.W.*, 113 S.W.3d 605, 612 (Tex. App.—Dallas 2003, pet. denied); *In re C.Q.T.M.*, 25 S.W.3d 730, 736 (Tex. App.—Waco 2000, pet. denied)).

According to Father, "evidence from a nearly 10-20 year old hearsay accusation was allowed in over multiple objections." Father appears to be referencing the Department's examination of Father concerning his 2002 statement to law enforcement in which he stated someone "started hitting [him] and told [him] it was because [he] supposedly molested [his] niece[]"; an uncertified police report

38

of a 2006 incident in which Daisy alleged that Father sexually assaulted her; and Petitioner's Exhibit 62, a 2006 forensic interview of Daisy. According to Father, this evidence demonstrates no "fact of consequence" because there is no link to Amy. Father's complaints on appeal pertain to Rules of Evidence 401 and 403. Father also argues that accusations of sexual assault are "per se slanderous[,]" although Father cites no legal authority for this argument. *See* Tex. R. App. P. 38.1(i) (an appellate brief must cite to the record and to relevant legal authority).

Father argues that the Facebook memes and posts in Petitioner's Exhibits 4 through 56 were also admitted in error. At trial, Father objected to these items based on Rules 401 and 403. The Department explained that the Father's Facebook account and posts were relevant to the best interests of the child determination. The trial court overruled Father's objection and explained that the Department was entitled to make its lawsuit, and if evidence was admitted that was not relevant, "hopefully the Judge will be smart enough not to consider it." Father agreed that the exhibits were postings shown on his Facebook account, but Father argued that Amy would not have seen them.

Father's appellate brief argues that Father was asked to read a statement at trial over objection "and with no exception to hearsay given." The statement to which Father objects on appeal is Petitioner's Exhibit 3. At trial, Father

acknowledged that Exhibit 3 was his statement, and the exhibit reflects Father's signature. Father's brief does not identify where he objected to the admission of Exhibit 3 based on hearsay, nor do we find any such objection in the record. Thus, Father failed to preserve this argument. *See* Tex. R. App. P. 33.1. That said, even if Father had made a timely "hearsay" objection to Exhibit 3, the trial court could have concluded the statement was not hearsay because a statement by a party opponent is admissible under Rule 801 as nonhearsay. *See* Tex. R. Evid. 801(e)(2)(A); *Bay Area Healthcare Group, Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007). Father did object to having Father read the statement because it was already in evidence, but on the record before us we cannot say that the trial court abused its discretion in admitting the complained-of evidence.

We note that, although the "uncertified police report" of the alleged 2006 sexual assault is included in the appellate record, none of the parties to this appeal identified when during the trial this exhibit was admitted into evidence. Even assuming the exhibit was admitted, a police report may be admitted in a civil case under the public records exception to hearsay provided the proper foundation is established. *See* Tex. R. Evid. 803(8); *In re E.A.K.*, 192 S.W.3d 133, 145 n.17 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (citing *Corrales v. Dep't of Family & Protective Servs.*, 155 S.W.3d 478, 486 (Tex. App.—El Paso 2004, no pet.) (while

40

a police officer's factual findings in a police report may qualify as a public record, the statements of witnesses in the report would not)). And Texas courts have considered evidence of alleged criminal conduct as relevant to determining whether a parent's rights should be terminated, even if the alleged conduct has not resulted in a conviction. *See Davis v. Tex. Dep't of Family & Protective Servs.*, No. 03-11-00314-CV, 2012 Tex. App. LEXIS 1315, at \*\*10-11 (Tex. App.—Austin Feb. 15, 2012, no pet.) (mem. op.).[5]

Father did not explain to the trial court, and does not explain on appeal, how any of the complained-of evidence was *unfairly* prejudicial. *See* Tex. R. App. P. 38.1(i); *Murray*, 294 S.W.3d at 369 (citing *Goldberg v. State*, 95 S.W.3d 345, 367 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd). We presume that the trial court performed a Rule 403 balancing test and determined the evidence was admissible

---

[5] Citing *In re S.R.*, No. 10-10-00063-CV, 2010 Tex. App. LEXIS 9681, at \*\*11-12 (Tex. App.—Waco Dec. 8, 2010, pet. denied) (mem. op.) (evidence of arrest and pending charge for DWI was admissible for purpose of determining best interest of child); *In re J.W.*, 113 S.W.3d 605, 612 (Tex. App.—Dallas 2003, pet. denied) ("the evidence of the arrests and pending prosecutions was relevant in determining whether allowing [the parents] to retain their parental rights would be in the children's best interest"); *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) (appellant's inability to maintain lifestyle free from arrests and incarcerations supported jury's endangerment finding and was also relevant to best-interest determination); *Trevino v. Tex. Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 248 (Tex. App.—Austin 1995, no writ) (concluding that appellant's criminal conduct and imprisonment were relevant to best-interest determination).

41

under Rule 403. Father has also failed to demonstrate how the admission of these items of evidence probably led to a decision on an improper basis. *See Able*, 35 S.W.3d at 617. Father's conclusory argument that his rights were harmed by the admission of the complained-of evidence is insufficient to overcome the presumption of probativeness or to show that the "'whole case turns on the particular evidence . . . admitted.'" *See Murray*, 294 S.W.3d at 370 (quoting *Trevino v. Tex. Dep't of Protective & Regulatory Servs.*, 893 S.W.2d 243, 249 (Tex. App.—Austin 1995, no writ)). We overrule Father's sixth issue.

Evidence of a Prior Termination

Mother's sixth issue argues that the trial court erred in admitting Petitioner's Exhibit 60, an order terminating Mother's parental rights to Benny, a child born before Amy. According to Mother, the Department had not produced a copy of this prior termination order during discovery, as required by Texas Rule of Civil Procedure 193.6. In issue seven, Mother argues that the trial court erred when it terminated her parental rights to Amy under subsection 161.001(b)(1)(M) because the only evidence that would support this ground for termination was Exhibit 60. Under subsection 161.001(b)(1)(M), a court may terminate parental rights if the parent previously "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of

Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." *In re Z.M.M.*, No. 18-0734, 2019 Tex. LEXIS 464, at \*2 (Tex. May 17, 2019) (citing Tex. Fam. Code Ann. § 161.001(b)(1)(M)).

Mother's brief argues that her attorney in this proceeding was different from her attorney in the previous proceeding terminating rights to Benny and "since such cases are sealed, [Mother] would not have been able to access such a record on her own." Mother did not make this argument to the trial court. To preserve error for appellate review, "'a party's argument on appeal must comport with its argument in the trial court.'" *Tate v. Andrews*, 372 S.W.3d 751, 754 (Tex. App.—Dallas 2012, no pet.) (quoting *Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 170-71 (Tex. App—Dallas 2009, no pet.)). Mother also fails to support her appellate argument with citations to the record or to legal authority. *See* Tex. R. App. P. 38.1(i).

In this case, the final order being appealed stated that the court "examined the record and heard the evidence and argument of counsel[.]" During trial, the court took judicial notice of all documents on file. In a bench trial, any erroneous admission of evidence does not warrant reversal when other record evidence supports the trial court's decision. *See Nat. Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 410 (Tex. App.—Amarillo 2003, pet. denied). "[A] trial court

43

may take judicial notice of its own records in a cause involving the same subject matter between the same, or practically the same, parties." *Gardner v. Martin*, 345 S.W.2d 274, 276 (Tex. 1961); *see also In re J.R.*, No. 02-18-00317-CV, 2019 Tex. App. LEXIS 339, at *23 n.16 (Tex. App.—Fort Worth Jan. 17, 2019, pet. denied) (mem. op.) ("Although the family service plan was not admitted into evidence during trial, we may presume that the trial court took judicial notice of the family service plan."); *In re K.F.*, 402 S.W.3d 497, 505 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) ("A trial court may take judicial notice of the records in its own court filed in the same case, with or without the request of a party.").

At trial, the Department offered Exhibit 60 (a certified copy of the final order of termination as to Adam's and Mother's rights to Benny) during the cross-examination of Adam Wortman, Mother's husband at the time of trial and Benny's biological father. Mother's attorney objected that she did not "recall seeing it" in what was provided in discovery. Counsel for the Department told the court that the document had been provided in discovery and told the court she could provide a document log. The trial court asked Mother's attorney if she was surprised by the document, and Mother's attorney responded that she was "not unaware of the termination" but that she was unaware of all the grounds for the termination. The Department's attorney also informed the trial court it could take "judicial notice" of

44

the document. The parties and the court discussed on the record the application of judicial notice to the previous final order of termination. "[A] court will take judicial notice of another court's records if a party provides proof of the records." *Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623 (Tex. 2012); *see also* Tex. R. Evid. 201. Judicial records of other courts[6] must be established by introducing into evidence authenticated or certified copies of those records. *Ex parte Wilson*, 224 S.W.3d 860, 863 (Tex. App.—Texarkana 2007, no pet.). Petitioner's Exhibit 60 bears the stamp of the District Clerk's Office of Montgomery County, certifying that the document was a true and correct copy of the original record filed in the termination proceeding. We conclude that the trial court could properly take judicial notice of the final order in Petitioner's Exhibit 60.

Exhibit 60 states that the trial court found by clear and convincing evidence that termination of the parent-child relationship between Mother and Benny was in the child's best interest and that Mother had constructively abandoned Benny, had failed to comply with the court-ordered service plan, had knowingly placed or allowed Benny to remain in situations that endangered his physical or emotional well-being, and had engaged in conduct or knowingly placed Benny with persons

---

[6] The 2013 final order of termination of parental rights as to Benny issued from the 418th District Court of Montgomery County, Texas, whereas the instant case was heard by the County Court at Law No. 3 for Montgomery County, Texas.

who engaged in conduct that endangered Benny's physical or emotional well-being. The order was signed by Mother's attorney in that proceeding.

Mother's service plan in the current case was filed with the court and stated in part that

> [Mother] has previous CPS history and she does not have custody of her other children. In her previous CPS case, [Mother] and her boyfriend tried to conduct a C-Section in the woods which resulted in the removal of her son who was later adopted.

At trial, Mother testified that her parental rights to Benny were involuntarily terminated. She testified that she had been told she attempted to deliver Benny by herself, but she did not have any recollection of it because she had taken "an exceptional amount of Special K and . . . had a mental block on everything almost." Mother added that "Special K" is "a horse tranquilizer" that causes hallucinations. According to Mother, she had told a psychologist that she performed her own C-section because she "could only state what other people told [her] and what [she] can remember." Adam, Mother's husband at the time of trial and Benny's biological father, testified that CPS became involved with Benny from the time of delivery. According to Adam, he and Mother were camping or living in the woods when Mother went into labor, and Adam and Mother were not prepared for anything going wrong during the delivery. Adam explained that the baby was not coming out for a long time after Mother's water broke, so Mother tried to cut herself on her scar from

46

a previous C-section. The CASA testified that Mother's rights to another child were terminated and "according to [the] Texas Family Code, that can be used as a basis for termination of a current case."

On this record, we cannot say the trial court would have abused its discretion in concluding that there was a lack of unfair surprise, and we cannot say that trial court abused its discretion in admitting Petitioner's Exhibit 60. *See Robinson*, 923 S.W.2d at 558; *Good v. Baker*, 339 S.W.3d 260, 271 (Tex. App.—Texarkana 2011, pet. denied). The trial court could have determined that evidence of the previous termination of Mother's rights to a child as well as the basis for that termination came in through other testimony without objection. When evidence identical or like the objected-to evidence is admitted elsewhere without objection, there is no harm. *See In re R.H.W.*, 542 S.W.3d 724, 740 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

Petitioner's Exhibit 60, together with the testimony and evidence discussed above, provided a clear and convincing basis for termination of Mother's parental rights to Amy based on subsection 161.001(b)(1)(M)—previous termination of Mother's parental rights with respect to another child based on a finding that her conduct violated subsections D or E. *See* Tex. Fam. Code § 161.001(b)(1)(M). We overrule Mother's sixth and seventh issues.

47

## Exclusion of Mother's Witness

Mother's tenth issue argues that the trial court erred in excluding the testimony of Mother's witness Susan Sorenson, who taught a parenting class that Mother took in Florida. At trial, when Mother called Sorensen as a witness, the Department stated that Sorensen had not been disclosed as a witness until February 4, 2019. Mother's brief does not dispute the alleged date of the disclosure. Mother's trial counsel told the trial court she had not filed a motion for leave to identify the witness late. On appeal, Mother argues there was no surprise to the Department in calling this witness because the witness's name and resume had been disclosed twenty-one days before she was called as a witness. The trial court sustained the Department's objection but permitted Mother to make a bill of exception, during which it was shown that Sorensen would have testified that Mother scored "very high" on the pretest for the course and "high average[]" on other tests. On appeal, Mother argues that Sorensen's testimony would have shown Mother's "dedication to going above and beyond her requirements of the service plan[]" and would have been very beneficial in considering the best interest of the child.

On this record, we conclude that the trial court would not have erred in determining that Mother did not carry her burden to establish good cause or lack of unfair surprise or prejudice. *See* Tex. R. Civ. P. 193.6(b); *Baker*, 339 S.W.3d at 271.

48

And Mother has not shown the exclusion of Sorensen probably resulted in an improper judgment or that the judgment turned on the exclusion of this evidence. Tex. R. App. P. 44.1(a)(1). We overrule Mother's tenth issue.

Other Statutory Grounds for Termination

In three issues, Mother challenges the sufficiency of the evidence to support the trial court's findings as to her under subsections D, E, and O of section 161.001(b)(1) of the Family Code. In three additional issues, Mother argues that the trial court erred by denying her motion for a directed verdict on subsections D, E, and O. In three issues, Father argues the evidence is not legally sufficient to support the trial court's findings as to him under subsections D, E, and O of section 161.001(b)(1).

Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the

49

child[.]" *Id.* § 161.001(b)(1)(E). Parental rights may be terminated under subsection

O if clear and convincing evidence supports that the parent:

> . . . failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child[.]

*Id.* § 161.001(b)(1)(O). Under subsection D, parental rights may be terminated based

on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex.

App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex.

App.—Texarkana 2003, pet. denied)). Termination under subsection E requires

more than a single act or omission and a "'voluntary, deliberate, and conscious

course of conduct by the parent is required.'" *Id.* at 923 (quoting *Perez v. Tex. Dep't*

*of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004,

no pet.)). We examine the time before the child's removal to determine whether the

environment of the home posed a danger to the child's physical or emotional well-

being. *Id.* at 925 (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana

2004, no pet.)). "'A child is endangered when the environment creates a potential

for danger that the parent is aware of, but disregards.'" *Id.* (quoting *In re N.B.*, No.

06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana

May 8, 2012, no pet.) (mem. op.)). The child does not have to suffer actual injury; it is enough that the child's well-being be jeopardized or exposed to loss or injury. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.).

Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Although incarceration alone may not support termination, evidence of criminal conduct, convictions, and imprisonment together with other conduct may support a finding of endangerment under subsection E. *See In re A.R.M.*, No. 14-13-01039-CV, 2014 Tex. App. LEXIS 3744, at *21 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.); *In re R.W.*, 129 S.W.3d at 743 (father's criminal history and resulting imprisonment alone was insufficient to support an endangerment finding, but when considered with the evidence of father's history of substance abuse, mental instability, and sexual misconduct, such evidence provides further proof of a course of conduct that endangered the child's well-being); *In re J.T.G.*, 121 S.W.3d 117, 133 (Tex. App.—Fort Worth 2003, no pet.) (evidence of father's prior criminal conduct was relevant to endangerment determination). Abusive or violent conduct by a parent may also produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

A pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use actually injured the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use and drug-related criminal activity is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *see also In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's continued drug use when the custody of her child is in jeopardy supports a finding of endangerment. *See In re S.R.*, 452 S.W.3d at 361-62; *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). A parent's drug use, prostitution, incarcerations, incidents of domestic violence,

criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at \*\*15-16 (Tex. App.—Beaumont Apr. 11, 2019); *see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987); *In re D.O.*, 338 S.W.3d 29, 36-37 (Tex. App.—Eastland 2011, no pet.); *In re V.V.*, 349 S.W.3d 548, 553-54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Evidence of a parent's endangering conduct toward other children or family members is also relevant to a determination of whether the parent engaged in behavior that endangered the child that is the subject of the suit. *See In re Baby Boy R.*, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (parent's guilty plea of aggravated sexual assault of his step-daughter was evidence of conduct endangering to the well-being of his unborn child); *In re R.W.*, 129 S.W.3d at 742 ("[E]vidence of sexual abuse of one child is sufficient to support a finding of endangerment with respect to other children.").

Mother's brief argues that there was no evidence that Amy's home environment or Daisy's residence was a dangerous environment or that anyone at the Dowlings' home created an environment that endangered Amy. Although

Mother acknowledges having a "history with drugs and problems in relationships[,]" she argues that misconduct or neglect in the past is not sufficient to show present unfitness.

The appellate record includes evidence of numerous facts that demonstrate conduct and behavior of endangerment. Mother left Texas, left Amy with Daisy, and then changed her mind about how long she would be gone even though Daisy had never kept Amy for more than one or two days at a time. Mother failed to make additional plans for Amy's care. Mother had a positive drug test during the pendency of this case. Mother and Amy continued to live with the Dowlings, even though Mother said the Dowlings held her against her will, gave her drugs, and kept her in prostitution. Mother stayed at the Dowlings' house even after Father broke into the room and held a knife to Mother, and Mother returned to the Dowlings after leaving, despite the serious allegations of abuse and criminal behavior that Mother made against the Dowlings. Mother currently lives with Adam, who has past criminal convictions for arson and aggravated assault/bodily injury, and before trial here she had not informed CPS that she had married Adam and was living with him. Mother admitted to domestic violence in her personal relationships. Mother admitted she had memory problems as a result of her drug use. Mother no longer had parental rights to any of her other three living children, including an involuntary termination

that followed her alleged attempt to perform a C-section on herself. Mother did not contact the police or seek medical attention for Amy even though she suspected Amy had been sexually abused. Mother was convicted twice in 2018 for evading arrest and in 2017 for criminal trespass and missed one visitation with Amy because she was incarcerated. CPS suspended Mother's visits with Amy because the visits were "traumatic[]" and Amy appeared to be frightened of Mother. The record supports a conclusion that Mother's life had been characterized by uncertainty and instability.

Father argues that all evidence about any endangering conditions pertained to when the child was with Mother. Father also argues that, at the time Amy was removed from Daisy's home, there had been no harm to Amy and Amy had no bruises or injuries. However, the appellate record includes evidence that Father broke into Mother's room at the Dowlings', where Amy also lived, and threatened Mother with a knife. When Father was incarcerated, he left Amy in Mother's sole care. Father has a history of incarceration and allegations of criminal conduct. Father has a history of illegal drug use. Father did not have a valid driver's license at the time of trial, yet he planned to visit Amy in Florida, where he hoped Amy would be living with Mother. Father's visits with Amy were terminated by the Department upon the recommendation of a counselor because Amy appeared to have no emotional connection with him and there was no foundation for a relationship

between them. The record supports a conclusion that Father's life had also been characterized by uncertainty and instability.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could have reasonably formed a firm belief or conviction that Mother and Father, through their individual acts or omissions or through a course of conduct, endangered Amy's physical or emotional well-being. We conclude the Department established, by clear and convincing evidence, that Mother and Father committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude that even the disputed evidence is not so significant that the court could not reasonably have formed a firm belief or conviction that Mother and Father endangered Amy. *See In re J.F.C.*, 96 S.W.3d at 266. We also conclude that the trial court did not err in denying Mother's motion for directed verdict because the Department put forth more than a scintilla of evidence to support subsections D and E. *See King Ranch*, *Inc.*, 118 S.W.3d at 751.

Having concluded that the evidence is legally and factually sufficient to support the trial court's findings of endangerment under subsections D and E as to both Mother and Father, we need not discuss subsection O. *See In re A.V.*, 113

56

S.W.3d at 362; *see also* Tex. R. App. P. 47.1. We overrule Mother's first, second, third, fourth, eighth, and ninth issues, and we overrule Father's first, second, and third issues.

Best Interest of the Child

Both parents challenge the trial court's finding that termination of their parental rights was in the best interest of the child. Mother argues that the Department failed to present evidence in its case in chief that termination was in Amy's best interest and that the trial court erred in denying Mother's motion for directed verdict. Mother and Father also argue that the record fails to show by clear and convincing evidence that termination of parental rights was in Amy's best interest. Mother argues that the representative for the Department never testified that termination of Mother's parental rights was in Amy's best interest and that the CASA gave only conclusory testimony that termination was in Amy's best interest. Mother also claims that she has prepared a stable home for Amy and has participated in numerous services to improve herself as well as her parenting abilities. Father argues that Amy has been in six different placements, including one in which she was "physically assaulted[,]" that no testimony was given regarding Father's parenting abilities, that the CASA lacked credibility, and that evidence of Father's Facebook posts and alleged sexual assault should have been excluded.

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). Nevertheless, there is a strong presumption that the best interest of a child is served by keeping the child with his or her parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2019).

The Family Code outlines factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child. *Id.* § 263.307(b). There are several factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544

S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re S.R.*, 452 S.W.3d at 369 (citing *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). A fact-finder may also consider the child's fear of a parent in making a best-interest determination. *See In re E.R.*, No. 01-17-00503-CV, 2017 Tex. App. LEXIS 11163, at **13-14, 31-32 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (mem. op.). When a child is unable to express her desires due to her young age, a trial court may consider whether the child has bonded with the foster parents and whether she calls a foster parent "mommy" or "daddy." *See In re A.M.*, 385

59

S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Stability and permanence weigh heavily in the determination of a child's best interest. *See In re J.D.*, 436 S.W.3d at 119-20 (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)). Evidence of a recent turnaround of a parent's past harmful behavior may be considered by the fact-finder, but it does not necessarily outweigh other evidence or require a fact-finder to "ignore a long history" of drug use and dependency, and a past history of a parent who has struggled to escape long-standing abusive relationships or other harmful behavior. *In re M.G.D.*, 108 S.W.3d 508, 513-14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, considering the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in Amy's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

In addition to the evidence supporting termination as summarized above, the appellate record includes evidence of the following: Mother testified she had made

significant life improvements since the case began, however Brenda testified that Mother did not have many months of sobriety, Brenda had been unable to get notes from Mother's counselor, she had not received proof that Mother was attending outpatient substance abuse counseling, she had only received a copy of one pay stub, and Mother did not maintain a working phone number. Mother testified that she had been diagnosed with ovarian cancer after her third child was born, but she had not received any further medical attention or treatment. Brenda expressed concerns that Mother and her current husband have "extensive drug use and criminal history," and CPS was worried that Mother's home would not be a stable home in which to place Amy. According to Brenda, during Mother's visits with Amy, Amy "looked terrified of her[,]" and was crying, and the visits were suspended after the therapist recommended it.

Father testified that he was not asking for Amy to be placed with him but for unsupervised visitation with Amy in Mother's home in Florida. Father was on probation at the time of trial and did not have a valid driver's license. At the time of trial, Father was living with his brother Ramon, and Brenda testified that Ramon had not been truthful with CPS and had borrowed a home for CPS to do a home study for possible placement with Ramon. Brandy Powell testified that she recommended termination of Father's visits with Amy because Powell observed no emotional

connection or relationship, and Powell feared that further visits would be confusing, traumatic, or emotionally damaging for Amy. Powell had "extremely high concern[]" that, if Amy were returned to Father, there was a "high chance" that emotional, psychological, or physical damage to Amy would result.

Brenda testified that the Department's plan was for the current foster parents to adopt Amy. The Foster Mother testified that Amy was happy in her home, that Amy receives play therapy regularly for issues with defiance and aggressive behavior, that Amy plays with dolls and loves to sing, and Amy says "I love you, mommy." According to the Foster Mother, Amy had not indicated she wanted to see Mother or Father. The CASA testified that Amy was receiving the care she needed in the current foster placement and he agreed that termination of Mother's and Father's parental rights was in Amy's best interest.

Deferring to the trial court's determination of the witnesses' credibility, on this record, we conclude that the evidence is legally sufficient to support the trial court's finding that terminating Mother's and Father's rights was in Amy's best interest. *See id.* We also conclude that the trial court did not err in denying Mother's motion for directed verdict because the Department put forth more than a scintilla of evidence that termination of Mother's parental rights was in Amy's best interest. *See*

*King Ranch*, *Inc.*, 118 S.W.3d at 751. We overrule Mother's eleventh and twelfth issues, and we overrule Father's fourth issue.

Having overruled all of Mother's and Father's issues, we affirm the trial court's final order.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on June 18, 2019
Opinion Delivered August 29, 2019

Before Kreger, Horton and Johnson, JJ.